[Cite as *State v. Beardsley*, 2026-Ohio-1083.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. {87}WD-25-038

    Appellee                                Trial Court No. 2024CR0274

v.

Devin A. Beardsley                        **DECISION AND JUDGMENT**

    Appellant                               Decided:  March 27, 2026

* * * * *

Paul A. Dobson, Esq., Prosecutor and
Charles R. McDonald, Esq., Assistant Prosecutor, for appellee.

Karin L. Coble, Esq., for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Devin A. Beardsley, appeals from a judgment of conviction and sentencing entered by the Wood County Court of Common Pleas. For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case

{¶ 2} Appellant was charged in a 22-count indictment on July 11, 2024, in Wood County Common Pleas Court. Counts 1 and 2 charged him with sexual imposition, in violation of R.C. 2907.06, both misdemeanors of the third degree. Counts 3 and 4 charged him with unlawful sexual conduct with a minor, in violation of R.C. 2907.04, both felonies of the third degree. Counts 5 through 19, inclusive, charged appellant with pandering obscenity involving a minor, in violation of R.C. 2907.321, all felonies of the second degree. Counts 20 and 21 charged him with pandering obscenity involving a minor, in violation of R.C. 2907.321, both felonies of the fourth degree. And Count 22 charged him with possessing criminal tools, in violation of R.C. 2923.24, a fifth-degree felony.

{¶ 3} A jury trial was held beginning on May 28, 2025, and ending on May 30, 2025. Appellant was convicted on all counts and sentenced to serve a definite minimum prison term of 29 years and an indefinite maximum prison term of 32 years. Although the State and appellant agreed that Counts 1 and 2 merged for purposes of sentencing, the trial court imposed sentences for each count. Appellant was also found to be a Tier II sexual offender.

{¶ 4} Appellant timely filed an appeal.

2.

## Statement of the Facts

{¶ 5} The victim, M.R., was born on October 9, 2006. When she was approximately 13 years old, she befriended appellant's daughter, A.B. It was through M.R.'s friendship with A.B. that M.R. met appellant.

{¶ 6} M.R. testified that in April 2021, while she was visiting A.B. at appellant's house, appellant began inappropriately touching her. She stated that appellant, who was "trying to comfort" her after she was having a bad day, went from "rubbing [her] back" to "touching [her] breasts and …butt." At the time, M.R. was 14 years old, and appellant was approximately 38 years old.

{¶ 7} M.R. testified that in August 2022, appellant progressed by tickling her outside of her pants from her inner thigh to her vagina.

{¶ 8} She testified that in September 2022, he performed oral sex on her at a park in Cygnet, Wood County. She specified that oral sex meant that appellant's mouth touched her vagina.

{¶ 9} M.R. then described a second -- separate -- incident that took place in September of 2022, this time during which appellant digitally penetrated her with his fingers in her vagina. All of these acts took place before M.R.'s 16th birthday.

{¶ 10} M.R. testified that she referred to appellant as her "sugar daddy." She explained, "So when I was younger I got addicted to nicotine, so vaping. And anything that I would do for him, he would buy me energy drinks, clothing, or in this case possibly

3.

a vape." She further testified that appellant told her that he loved her. M.R. testified, "It was weird. I didn't know how to feel. It was weird. It was rough. It was unknown."

{¶ 11} M.R. identified State's Exhibits 1-15. Each photograph was sent by M.R. to appellant and was then deleted. She explained, "It was a secret. I didn't want anyone knowing, he didn't want anyone knowing. So we both told each other to delete after we seen everything. And after we were done with our conversations we could delete them, go back into the trash and then delete them finally." She generally described that each photograph depicted her in a state of nudity, in Wood County, and that she had sent the photographs to appellant. It is undisputed that M.R. was a minor when she sent the photographs to appellant. M.R. additionally identified several "selfie" clothed photographs of her with appellant at the park in Cygnet.

{¶ 12} M.R. acknowledged that at one point she had been in a brief physical relationship with appellant's daughter, A.B., and at another point with his son, and that she had sent "inappropriate" images to one or the other of them, but that the images were not "as bad" as the ones she sent appellant.

{¶ 13} After M.R.'s step-mother, S.R., found text messages on M.R.'s phone where M.R. referred to somebody as her "sugar daddy," M.R. disclosed the abuse to her father.

{¶ 14} Detective Ryan Merrow, from the City of Perrysburg Police Division, testified that he performed forensic extractions from several of appellant's devices. He stated, "On one of the homemade desktop computers I found what I called a cached

4.

image of the victim in this case in a state of nudity. A cached image basically tells me that the device had viewed that picture. You know, I can't say forensically on my end if it was saved or not, but it was viewed." He further testified that the clothed selfies of M.R. and appellant were found in the digital recycle bin on a separate device. Merrow testified that he found additional child sexual abuse material ("CSAM"), not of M.R., on a portable hard drive. Merrow testified that both State's Exhibits 16 and 17 contained videos of minor females (not the victim), in various states of nudity and/or masturbating.

{¶ 15} Next, Merrow testified that a separate, EMTEC brand, portable hard drive was forensically extracted and searched. He determined that an Android device had been connected to the hard drive, and it was known to Merrow that appellant owned an Android device. On the EMTEC hard drive, Merrow found the nude photos of M.R. that were depicted in State's Exhibits 1-15. He explained that the device does not have independent internet access, and so it would have to have been physically connected to another device in order to receive data. In other words, the nude images of the minor victim could not have transferred automatically onto the EMTEC hard drive.

{¶ 16} Detective James Connin from the Wood County Sheriff's Office testified that he believed that appellant and M.R. would communicate via the Google Docs and Google Chat applications and then delete their conversations. He explained that the purpose of the Google Docs application is not to send messages back and forth, and that it is "highly editable." He stated that "not many people would communicate through Google Docs if they have Google Chat," but that in doing so, one "could fly…under the

5.

radar where your conversations could be with one another instead of it being more obvious with a chat."

{¶ 17} Connin noted that he located photographs and videos in appellant's Google Drive, the subject matter of which ranged from videos of appellant shooting firearms to videos and pictures of appellant and his wife engaging in intercourse, as well as nude pictures of minor victim M.R.

{¶ 18} Connin testified that the EMTEC hard drive, which contained the CSAM of M.R., was found inside a backpack that was discovered in appellant's car. Based on the metadata embedded in the CSAM photographs found on the EMTEC device, Connin was able to ascertain that the CSAM was taken, sent, and copied to the EMTEC hard drive between May 1, 2023 and August 4, 2023.

{¶ 19} Among the material Connin discovered was a document containing two photographs that were presented next to one another and were "essentially a side-by-side comparison" of appellant's wife, Alexandra Jablonski, and the victim, M.R.

{¶ 20} Next, Connin testified as to several conversations he discovered between appellant and his wife. On May 17, 2022, appellant said to his wife, "And later I'm hoping to give [first name of the victim] a cream pie." Connin explained, "So in terms and relevant to my investigation, a cream pie would be…a male that would ejaculate into a female's vagina and essentially let the sperm or the ejaculate go out, creep out."

{¶ 21} On May 18, 2022, the following exchange occurred:

Appellant: I should get a pill soon.

6.

Wife: Why pill?

Appellant: Why do you think?

Wife: [Vicim's first name]?

Appellant: Among other things.

{¶ 22} Connin testified that the conversation continued with appellant stating, "I want to give her the big dick/load for her to keep coming back," in reference to the minor victim.

{¶ 23} During the same conversation:

Appellant: So should I just cum inside her and hope she gets pregnant or talk to her first?

Wife: I'd say go with the flow and whatever feels natural.

{¶ 24} The troubling conversations continued on June 17, 2022:

Appellant: I should have my balls before [victim's first name] comes back.

Wife: You meant shave, LOL. Thought you lost your balls for a second.

Appellant: Oh, LOL, yeah, shave. But also I need them back from you before I fuck her.

Wife: Fair enough. I'll lend them to you.

{¶ 25} Connin testified that he discovered additional messages between appellant and his wife, this time referencing a person named Stephanie as well as M.R.:

7.

Appellant: Any suggestions with the grooming thing?

Wife: Go slower than with [victim's first name]. [Victim's first name] is a slut, Stephanie isn't.

Appellant: Define go slower. Like don't rush to fuck her?

Wife: Yes. I was going to type don't immediately go to boobs and ass, let her get comfortable out here first.

Appellant: So one is a fuck toy, the other the girlfriend or GF – GF material.

Wife: I wouldn't say that [victim's first name] is less GF, girlfriend, material than Stephanie, per se, but [victim's first name is] definitely more sexual.

{¶ 26} After the State rested, the defense called several witnesses, including appellant himself. Appellant confirmed that he met the victim when she was "about 14," that the victim was friends with his daughter, and that the victim would confide in him. Appellant admitted to hugging the minor and kissing her on her forehead, but denied any sexual contact or conduct with her, and denied receiving nude photographs from her.

{¶ 27} He stated that M.R. had told him that she was dating his daughter A.B., and that A.B. had a Motorola cell phone that was under his name and was logged into his Google account and not A.B.'s account. Thus, he stated, any messages or pictures would go to the same cloud account.

8.

{¶ 28} He further testified that the EMTEC device that was found in his truck belonged to his daughter. He admitted, however, that he himself had transferred several pictures of his wife in compromised sexual poses onto that same device. He explained that it was possible he used the drive and then forgot to delete the photos before giving it to A.B.

{¶ 29} Appellant testified that he would build computers for himself and others as a hobby, that he would often obtain parts through eBay or Craigslist, and that he would commonly receive a drive with information still on it.

{¶ 30} Finally, appellant testified that the references to [victim's first name] and Stephanie referred to co-workers he had been pursuing for purposes of finding a surrogate mother to have a baby for himself and his wife.

{¶ 31} Appellant's mother testified via Zoom from out of state. She testified that she had not seen anything inappropriate between her son and the minor victim, although she admitted to having been in Wood County only twice between 2020 and 2023.

{¶ 32} Appellant's wife, Alexandra Jablonski, also testified. She stated generally that she and appellant have an open marriage, and that they had talked about finding a surrogate to carry a child for them. She testified that she and appellant had talked about bringing in a couple of girls from work -- one of whom had the victim's first name and another named Stephanie -- for this purpose.

{¶ 33} Appellant also called his daughter, A.B., to testify. A.B. testified that M.R. was a friend and a one-time girlfriend. A.B. admitted that she had "behavioral issues" and

9.

went to a "behavioral school." She also admitted that she "was doings some shady online things," and so was not allowed to have a cell phone or tablet. Despite these alleged restrictions, A.B. claimed it was she who saved the nude photographs of the minor victim onto the EMTEC hard drive. But she could not recall what the hard drive looked like. She also claimed responsibility for hiding the device in appellant's car. A.B. testified that she hates M.R. for putting her dad in this position, and for "many other reasons."

{¶ 34} The State recalled Detective Connin as a rebuttal witness. He testified that A.B. had her own Google account and Google Chat, and he observed conversations between M.R. and A.B.'s Google account. No nude photos were sent between those two accounts.

{¶ 35} Over defense objection, Connin was permitted to testify that he found two nude pictures of M.R. on appellant's wife's phone as well.

{¶ 36} On cross-examination, Connin acknowledged that it was possible that A.B. was using appellant's account.

{¶ 37} The jury subsequently found appellant guilty on all 22 counts.

## Assignment of Error

{¶ 38} On appeal, appellant asserts the following assignment of error:

> I. The convictions are against the manifest weight of the evidence.

10.

**Law and Analysis**

**Assignment of Error**

{¶ 39} Appellant argues in his sole assignment of error that his convictions are against the manifest weight of the evidence. Essentially, he argues that he and his daughter, A.B., were credible witnesses, but that the victim was not.

{¶ 40} In determining whether appellant's conviction was against the manifest weight of the evidence, we must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide whether in resolving any conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the State; rather, we "sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.), quoting *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.). "Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact-finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). A court's "discretionary power to grant a new

11.

trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Ford*, 2019-Ohio-4539, ¶ 340, quoting *Thompkins* at 387.

{¶ 41} In making his argument, appellant asserts generally:

[that he] consistently denied the complete lack of any sexual relationship whatsoever with M.R. And, he has denied that the images and videos were sent to him. He also denied knowing about the films which were on hard drives in his backseat, claiming that they were purchased used from eBay or Craigslist and not properly wiped from the previous owner.

{¶ 42} Appellant further argues that:

A.B. took responsibility for creating the images of M.R. A.B. took responsibility for then copying those images onto an external hard drive and putting the hard drive in appellant's vehicle. A.B.'s testimony is credible. M.R. admitted to being in a romantic relationship with A.B. And A.B. admitted that her behavioral problems led her to engage in risky sexual behavior.

{¶ 43} While appellant argues that he and his daughter were credible witnesses and that the victim was not, the law is well-established that "'the jury was free to believe or disbelieve the testimony of any witness as to any issue, and the testimony of any one witness as to any material fact, believed by the trier of fact, is sufficient to prove any such fact.'" *State v. Neiss-Parsons*, 2021-Ohio-897, ¶ 22 (11th Dist.), quoting *State v. Jones*, 2007-Ohio-2425, ¶ 24 (2d Dist.).

{¶ 44} The jury's decision was not against the manifest weight of the evidence simply because it found M.R.'s testimony more credible than that provided by appellant and A.B. Given the M.R.'s testimony -- together with an abundance of additional

12.

evidence, including the State's exhibits and testimony by the other State's witnesses -- we find that the jury did not clearly lose its way in finding appellant guilty. As appellant's conviction is not against the manifest weight of the evidence, his assignment of error is found not well-taken.

**Sentencing Issue**

{¶ 45} Appellant raises for the first time in his reply brief a claim that his convictions under Counts 1 and 2 -- both of which were offenses of sexual imposition and misdemeanors of the third degree -- should have merged for purposes of sentencing. Specifically, appellant inaccurately argues that "the trial court *found* that Counts One and Two, both offenses of sexual imposition, misdemeanors of the third degree, merged for purposes of sentencing," yet "imposed a separate sentence" for each offense. (Emphasis added.)

{¶ 46} Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." The Supreme Court of Ohio has previously held that the imposition of multiple sentences for allied offenses of similar import is plain error. *See State v. Yarbrough*, 2004-Ohio-6087, ¶ 96-102; *State v. Underwood*, 2010-Ohio-1, ¶ 31. "This is true even if the trial court orders the defendant to serve the sentences for the allied offenses concurrently because '[t]he imposition of concurrent sentences is not the equivalent of merging allied offenses.'" *State v. Berry,* 2021-Ohio-2249 (6th Dist.), ¶ 21, citing *State v. Damron*, 2011-Ohio-2268, ¶ 17.

13.

{¶ 47} Here, *the State* communicated *its* understanding at the outset of the sentencing hearing that "counts 1 and 2, being misdemeanors, would merge as operation of law with any other sentence that the Court imposes." At the end of the hearing, however, the trial court imposed separate sentences for each count.

{¶ 48} The same sequence was essentially repeated in the sentencing entry, where the trial court, after mentioning that *the parties had agreed* that "the misdemeanors in Counts 1 and 2 merged for the purposes of sentencing," went on to impose separate sentences for each count.

{¶ 49} Our review of the record reveals that Count 1 related to an offense that was stated to have occurred "on or about April 1, 2021, and through April 30, 2021." Count 2, however, related to an offense that was stated to have occurred "on or about August 1, 2022, and through August 31, 2022." The victim testified to inappropriate touching that occurred in April 2021 and again in August 2022. All of the other remaining 20 offenses were alleged to have occurred between September 1, 2022 and September 30, 2022, between May 1, 2023 and August 4, 2023, or "on or about" August 4, 2023.

{¶ 50} Although the parties may have agreed that the two offenses should have merged -- either with one another or with any other offenses -- for purposes of sentencing, nowhere in the record is there a trial court finding to that effect. Very simply, the trial court must have disagreed with the agreement between the State and defense counsel. As we find no error, let alone plain error, in the trial court's having separately

14.

sentenced on Counts 1 and 2, we dismiss appellant's argument without additional consideration.

## Conclusion

**{¶ 51}** The judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also,* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.